Keating, J.
Selma Simpson was designated by her husband Leonard as the beneficiary of a group life insurance policy procured by his employer, Lebanon Cemetery Association of Queens, Inc. (hereinafter Lebanon), through the trustees of the Cemetery and Funeral Service and Supply Industry Group Insurance Ftind, from Phoenix Mutual Life Insurance Company (hereinafter Phoenix). The master policy issued by Phoenix on January 1, 1963 to Lebanon contained a provision that eligible employees for insurance coverage were all full-time employees regularly working at least 30 hours per week at the employer’s usual place of business.
Phoenix supplied enrollment cards to Lebanon to distribute to its eligible employees. The employees filled out the cards designating their beneficiaries.[1] The enrollment card 'Simpson executed contained a printed clause, above the blank left for the applicant’s signature, which read: “ I request the insurance for which I may become eligible under said Group Policy”. Simpson’s card along with those of the other employees was forwarded to Phoenix, which then issued individual certificates to each employee. The certificate was a multipage printed form. On the first page of the certificate the employee’s name and the amount of insurance coverage he was entitled to under the group policy were inserted. In addition, the first page noted *265 that the terms of insurance, which were contained in the master policy issued to Lebanon, were set out in the subsequent pages of the document. Simpson received such a certificate and, up until his death, Lebanon paid all the insurance premiums as they became due.
On June 17, 1964 Leonard P. Simpson was killed during a robbery in the elevator of his apartment house. Lebanon filed a notice of claim and proof of death with Phoenix on July 22, 1964 and requested the insurer to transmit the insurance proceeds directly to Mrs. Simpson. Phoenix, after investigating the claim, notified Lebanon that it had discovered that Simpson was not an eligible employee, as defined in the group policy, since he had not been employed 30 hours a week. Therefore, no proceeds would be paid to the employee’s beneficiary.
Selma Simpson commenced this action on April 22, 1966 to recover the amount which her husband’s certificate indicated his beneficiary was entitled to receive under the group life insurance policy. After issue was joined, plaintiff made a motion for summary judgment. In support of the motion, affidavits were submitted which admitted that Leonard Simpson, though employed by Lebanon, did not work 30 hours a week. Simpson was Lebanon’s assistant secretary and his duties required that he devote only a few days a month to the association’s business. His yearly remuneration never exceeded $1,000. Simpson’s principal vocation was the practice of law. Mrs. Simpson argued that summary judgment was proper, notwithstanding the fact that her husband did not work 30 hours a week, because the policy’s incontestable clause barred the insurer from asserting the defense of Simpson’s ineligibility at the inception of the group policy as the basis for refusing to pay the insurance proceeds.
In opposing the motion, Phoenix argued that employment eligibility, as established by the group policy, was a limitation of the risk it contracted to insure. Since eligible employment is a limitation rather than a condition, it argues that it was not barred from raising employment eligibility even though the period in which it could contest the validity of the policy had elapsed.
The Supreme Court denied summary judgment. The Appellate Division reversed, one Justice dissenting (30 A D 2d 265).
*266 The question posed for decision is whether employment, as defined in this group life insurance policy, is a condition of insurance or a limitation of the risk which the insurer contracted to underwrite. If employment is a condition the defense is now barred by the policy’s incontestable clause. (See Piasecki v. Metropolitan Life Ins. Co., 243 N. Y. 637; Killian v. Metropolitan Life Ins. Co., 251 1ST. Y. 44; Romano v. Metropolitan Life Ins. Co., 271 N. Y. 288.) If it is a limitation, the beneficiary cannot recover under the policy.
We conclude that employment, as defined in this group policy, is a condition of insurance and, therefore, since the insurer did not contest the employee’s eligibility within the period of contestability, it is barred from raising it as a defense to the beneficiary’s action (Eagon v. Union Labor Life Ins. Co., 3 N Y 2d 785).[2]
Our courts in the past have stringently enforced the incontestable provision required by statute to be included in every group and individual life insurance policy because of the important purposes which it is intended to serve. The provision safeguards an insured from excessive litigation many years after a policy has already been in force and assures him security in financial planning for his family, while providing an insurer a reasonable opportunity to investigate. The troublesome problem in interpreting the precise reach of the incontestable provision is to determine what defenses are barred to the insurer and those which may still be raised after the expiration of the contestable period.
Both parties direct our attention to the identical passage in Matter of Metropolitan Life Ins. Co. v. Conway (252 N. Y. 449, 452) as controlling the precise question for decision on this appeal. In Conway, Chief Judge Cardozo writing for a unanimous court stated, ‘ ‘ The provision that a policy shall be incon *267 testable after it has been in force during the lifetime of the insured for a period of two years is not a mandate as to coverage, a definition of the hazards to be borne by the insurer. It means only this, that within the limits of the coverage, the policy shall stand, unaffected by any defense that it was invalid in its mception, or thereafter became invalid by reason of a condition broken.” (Emphasis added.) Though this passage is instructive, in the context of this appeal it is not dispositive. The quoted passage establishes a frame of reference for decision but does not unequivocally indicate which particular risks are conditions of insurance and thus borne by the insurer, if not discovered and contested within two years of issuance of the policy, and those hazards considered limitations on the risk an insurer is willing to assume and, therefore, not barred by the lapse of time.
In New York the incontestable clause is viewed normally with reference to the manner of death. Risks which are considered limitations are those which could not be ascertained by the insurer by investigation at the time the policy of insurance was issued. (Matter of Metropolitan Life Ins. Co. v. Conway, supra; Matter of Metropolitan Life Ins. Co. v. Beha, 226 App. Div. 408, affd. sub nom. Matter of Metropolitan, Life Ins. Co. v. Conway, 252 N. Y. 449, supra; Woodbery v. New York Life Ins. Co., 129 Misc. 365, mod. on another ground 223 App. Div. 272.) If the additional risk to the insurer of issuing a policy to a particular applicant could have been discovered at the time the contract was entered into, the insurer is precluded from raising this fact as a defense after the period provided for in the incontestable clause has elapsed. It is only those risks which could not be ascertained at the time of contracting which can properly be viewed as a limitation on the risk of insurance. "Where the insurer cannot guard against assuming a risk it does not desire to insure by the simple expedient of investigating, such as risks of death in noncommercial aviation and while on active military duty, then the risk is properly classified as a limitation for purposes of analysis with respect to the incontestable clause (Insurance Law, § 155, subd. 2).
The hallmark of the distinction between conditions and limitations is discoverability. Undoubtedly, eligible employment is ascertainable when a group policy is issued. Therefore, unless *268 some distinctive characteristic exists between group life and individual life insurance, there is no logical reason to find employment a limitation rather than a condition.
Three major differences emerge when group life insurance is compared with individual life insurance. They are the nature of the insurance contract, the cost of insurance and the manner of selecting the risk to be insured. (Gregg, Group Life Insurance [3d ed., 1962], 3-4, 25-49, 172-1-85; Gregg, Life and Health Insurance Handbook [2d ed., 1964], 358-368.)
Group life insurance, though contracted for by an employer, is not indemnity insurance but simply insurance upon the life of employees for their personal benefit and the protection of those dependent upon them for financial security. An employee covered by a -group life policy necessarily takes into account the coverage extended by his employer in determining the amount of coverage he should seek, just as much as a person who seeks an individual policy. (Gregg, Life and Health Insurance Handbook [2d ed., 1964], 367.) Thus, both group life and individual life insurance have the same ultimate goal—personal security of the insured’s beneficiaries.
Group life insurance is normally offered as a fringe benefit. This type of insurance coverage is obtained by an employer at favorable rates because selling and administration costs to the insurer are appreciably smaller than the costs of selling and administering the same number of individual policies. It is evident that the first two distinctions between group and individual life policies are not critical ones. The principal difference between group life and individual life insurance is the selection process. It is upon this distinction the insurer would have us focus.
The major distinction is that under a group insurance policy a greater number of persons who would not ordinarily procure insurance are covered because of the requirement, for employer-paid plans, that all employees be included. The population which comprises the employees in a group insurance plan, therefore, constitutes a better insurance risk, taken as a group, from a statistical vantage point, than the same number of persons seeking private policies. It is the process of self-selection in individual life policies which accounts for the greater risk from the point of view of the insurer. Insurers fear that the same *269 possibility of “ adverse selection” will exist in group policies if noneligible employees are included because these persons may well be those who are unfavorable insurance risks and who could not procure private insurance except at preferred rates. For example, the private entrepreneur may list his sick son-in-law as an employee.
This problem of adverse selection, however, is not indigenous to group policies but has confronted insurers in individual policies long before group policies came into existence. The same problem has confronted insurers in determining the health status of individuals seeking private insurance. The problem was met in individual policies by requiring physical examinations and investigating medical history. Likewise, it is equally possible to determine employment eligibility by ascertaining employment status at the inception of the plan. Eligible employment can be determined by investigating membership rolls or employment records. The cost of this investigation is appreciably less than medical investigation in private policies and can be undertaken by a nonprofessional staff. The larger the number of persons which comprise the group the more sophisticated will be the accounting system to keep track of the group. The better the record-keeping system, the easier it will be for one to have access to information to determine eligibility. The fact that some insurers in the past have not investigated an employee’s eligibility until death cannot be given any weight.
We cannot conclude that the difference in the selection of risks in group as opposed to individual life policies is so significant that it requires a departure from the traditional interpretation of conditions and limitations under New York law. Phoenix had the opportunity at the time it issued the certificates, or within two years of this date, to determine whether in fact the insured was a proper member of the group. The insurer, having failed to investigate, cannot be heard to complain now.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Chief Judge Finn and Judges Burke, Scieeppi, Bergak, Brritel and Jasset concur.
Order affirmed.

. The policy in dispute was actually a successor policy to one Lebanon had negotiated with Phoenix before it took out the group plan offered by the Association. Phoenix did not require Lebanon to supply new enrollment cards for its employees and simply used the cards already filed.

. See John Hancock Mut. Life Ins. Co. v. Dorman, 108 F. 2d 220 (9th Cir.); Equitable Life Assur. Soc. v. Florence, 47 Ga. App. 711; Allison v. Aetna Life Ins. Co., 158 So. 389, amd. 161 So. 645 (La. App.); Baum v. Massachusetts Mut. Life Ins. Co., 357 P. 2d 960 (Okla.). Contra, Fisher v. United States Life Ins. Co., 249 F. 2d 879 (4th Cir.); Washington Nat. Ins. Go. v. Burch, 270 F. 2d 300 (5th Cir.); Carp v. California-Western States Life Ins. Co., 252 F. 2d 337 (5th Cir.); Fisher v. Prudential Ins. Co., 107 N. H. 101; Rasmussen v. Equitable Assur. Soc., 293 Mich. 482; Spitz v. Continental Cas. Co., 40 Wis. 2d 439.